UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| DELBERT S. GADDIS, III, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:21-cv-00140-SEB-KMB |
| | ) |
| CYNTHIA KEMP, | ) |
| ROY WASHINGTON, | ) |
| | ) |
| Defendants. | ) |

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND DIRECTING FURTHER ACTION**

Plaintiff Delbert S. Gaddis III filed this suit under 42 U.S.C. § 1983 alleging that Defendants violated his constitutional rights by failing to provide him with adequate medical care while he was incarcerated at the Crawford County Jail ("Jail"). Dkt. 57 (Order Screening Second Amended Complaint); dkt. 58 (Second Amended Complaint). Defendants have moved for summary judgment. Dkt. 101. For the reasons explained below, genuine issues of material fact exist, and the motion is **denied**.

**I.
Embedded Motion to Supplement**

In their summary judgment motion, Defendants argue that they provided constitutionally adequate care for three of Mr. Gaddis's medical conditions—knee pain, back pain, and high blood pressure. Dkt. 103 (brief in support of summary judgment motion). In response, Mr. Gaddis contended that genuine issues of material fact existed for trial because Defendants did not address

another one of his conditions—a hand injury he suffered after punching a wall. Dkt. 104. In reply, Defendants argued:

> Medical Defendants did not address that issue in their Motion for Summary Judgment and specifically included a footnote to their Statement of Facts explaining that Plaintiff received medical care for other issues in the jail but that the Summary Judgment Motion was limited to the facts regarding the medical issues in this lawsuit. The Court's Screening Order, which lays out the claims Plaintiff is allowed to proceed on, did not specify any claims regarding a broken right hand. The Court's Screening Order was limited to Plaintiff's claims of inadequate treatment for his knee issue, a back issue, high blood pressure, and his desire for an MRI. Plaintiff was then given a deadline of February 18, 2022 to notify the Court if he wanted to proceed on any issues not specified by the Court's Screening Order. *See Court's Docket No. 29*. Plaintiff did not take that opportunity to inform the Court and the parties that his broken right hand was an issue. If the Court clarifies that Plaintiff's broken right hand is indeed part of this lawsuit, then Defendants request time to file a supplemental brief on just that issue to be considered with their Motion for Summary Judgment.

Dkt. 108 at 3–4.

Defendants' embedded request for time to supplement their summary judgment motion is **denied**. First, the request runs afoul of Southern District of Indiana Local Rule 7-1(a), which provides, "Motions must be filed separately, but alternative motions may be filed in a single document if each is named in the title. A motion *must not be contained within a brief, response, or reply* to a previously filed motion, unless ordered by the court." S.D. Ind. L. R. 7-1(a) (emphasis added).

Second, even if Defendants had properly filed a motion, the Court would deny it. The summary judgment deadline had already passed when Defendants asked for time to add new arguments to their summary judgment brief. To grant the request to effectively extend the summary judgment deadline so that Defendants could brief the hand injury, the Court would have to find excusable neglect for their failure to address the right-hand injury in their original summary judgment briefing. Fed. R. Civ. P. 6(b)(1)(B); *Bowman v. Korte*, 962 F.3d 995, 997–99 (7th Cir. 2020) (finding that district court abused its discretion in allowing defendants to file untimely

summary judgment motion without finding excusable neglect under Rule 6(b)(1)(B)). To find "excusable neglect," courts should consider all relevant circumstances surrounding the party's neglect, including the prejudice to the non-movant, length of delay, and reason for delay. *Id.* at 998.

Defendants haven't shown that their failure to address the right-hand injury was caused by excusable neglect. Instead, they effectively blame the Court and Mr. Gaddis for their omission—arguing that the Court didn't mention the hand injury in its Screening Order and that Mr. Gaddis failed to inform the Court of that omission.

It is certainly true that the Court did not address the hand issue in the Screening Order discussed in Defendants' reply, but Defendants' reply fails to mention that—after that Screening Order was issued—the Court allowed Mr. Gaddis to file a second amended complaint and screened it. Dkt. 57. That second Screening Order specifically mentioned the hand injury when it summarized the basis for Mr. Gaddis's claims:

> On October 7, 2021, Mr. Gaddis was sent to the emergency room for pain and swelling in his hands after he punched a wall. He was diagnosed with a bone fracture in his right hand. He was given ice for swelling and told to see an orthopedic doctor within a week. His hand was not splinted or put into a cast. After his return to the Jail, Mr. Gaddis only received ice, and he never was sent to the orthopedic doctor. Nurse Practitioner Washington never examined Mr. Gaddis but simply overrode the emergency doctor's order and decided that Mr. Gaddis should not see an outside specialist.

*Id.* at 4. Defendants' counsel certainly knew about the second amended complaint—and presumably the second Screening Order—because they answered the second amended complaint the day after the second Screening Order was docketed. Dkt. 59. Defendants' counsel also received a copy of the second Screening Order via the Court's CM/ECF system. Dkt. 57.

The Court will not speculate as to why Defendants' reply fails to acknowledge the existence of the second amended complaint and the second Screening Order. Perhaps some neglect

3

contributed to Defendants' failure to address the hand injury in their original summary judgment motion and their failure to mention the second Screening Order in their reply, but Rule 6(b) requires more than ordinary neglect—it requires excusable neglect. *Bowman*, 962 F.3d at 998. And Defendants haven't shown that any neglect here was excusable. The delay was significant—Defendants didn't ask for time to supplement until two months after the summary judgment deadline. And the potential for prejudice to Mr. Gaddis is plain because he explained why fact issues existed as to the adequacy of the treatment for his hand in his response, which would allow Defendants to tailor their new arguments to that explanation. Regardless, even if there were no prejudice, the fact remains that Defendants have not offered a legitimate reason for failing to address the right-hand injury in their opening motion, which is fatal to their request. *Id.* (defendants' failure to explain counsel's oversight is fatal under Rule 6(b)).[1] Defendants also have not explained why they could not have at least briefed the issues related to the right-hand injury in their reply brief, which they were given additional time to file. *See* dkt. 107.

For all of these reasons, the Court **denies** Defendants' request for leave to supplement their summary judgment motion to address the treatment of Mr. Gaddis's right-hand injury.

## II.
## Legal Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable

---

[1] The result would be the same even if the Court considered whether Defendants had stated good cause for the failure, as set forth in the portion of Rule 16(b)(4) allowing for amendment of a scheduling order for "good cause." The "good cause" standard is even higher than the excusable neglect standard. *Bowman*, 962 F.3d at 998.

4

to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

### III.
### Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar*, 985 F.3d at 572–73.[2]

**A. The Parties**

For purposes of summary judgment, the parties agree that Mr. Gaddis was a pretrial detainee. *See generally* dkts. 103, 105.

---

[2] In their reply, Defendants object that Mr. Gaddis's summary judgment affidavit includes statements that are inadmissible because they are not based on personal knowledge or hearsay. Dkt. 108 at 1–3. The Court has not considered those statements.

Roy Washington was a nurse practitioner ("NP") who served as the primary care provider for inmates at the Jail and could prescribe medication, diagnose patients, and develop treatment plans for patients just like a physician. Dkt. 52 at 1. He was physically at the Jail one day every two weeks to see patients and was on call at all times to answer questions, prescribe medications, or handle any medical issues that arose at the Jail when he was not physically present. *Id*. When he was not at the Jail, he relied on the Jail's nursing staff to be his "eyes and ears" and to communicate patients' medical needs to him. *Id.*

Cynthia Kemp was a licensed practical nurse ("LPN") at the Jail. Dkt. 104 at 1. As an LPN, she could not diagnose patients, create treatment plans, determine courses of treatment, order medical treatment, or prescribe medications. *Id*. She could triage and assess patients, take vital signs, communicate a patient's condition to the medical provider (a physician or NP), and provide treatment pursuant to the provider's orders. *Id.*

### B. Mr. Gaddis's Medical Conditions

#### 1. Knee and Back Pain

Mr. Gaddis entered the Jail on May 15, 2021. Dkt. 105-1 at 1.[3] During his medical screening at intake, he reported having arthritis in his knees and a slipped disc in his lower back. Dkt 104-1 at 1. On May 19, LPN Kemp saw Mr. Gaddis because an officer told her he was complaining of knee pain. Dkt. 104 at 2–3. Mr. Gaddis told her his knee was dislocated, showed her his injury, and said he needed an MRI. Dkt. 105-1 at 4. She refused to provide medical care and told him he would have to see an orthopedic doctor after being released from the Jail. *Id.* at 9.

During the interaction, LPN Kemp observed that Mr. Gaddis walked with his left leg off the ground. Dkt. 104 at 2. After seeing Mr. Gaddis, she called NP Washington and reported Mr.

---

[3] Mr. Gaddis incorporates handwritten notes into his affidavit, which was made under penalty of perjury, so the Court considers them for summary judgment purposes. Dkt. 105- at 1.

Gaddis's complaints, history, and the information she had gathered from him. *Id.* at 3. In his summary judgment affidavit, NP Washington testifies that he did not issue any treatment orders or prescribe any medication because it appeared to him that Mr. Gaddis's knee injury was "chronic and long-standing and it did not impact his ability to function and walk." Dkt. 104-2 at 1. Thus, he testifies, he had no reason to order an MRI or medication or send him to the hospital. *Id*. Similarly, LPN Kemp states in her summary judgment affidavit that she saw no reason to send Mr. Gaddis to the hospital or question NP Washington's decision. Dkt. 104 at 3.

In his summary judgment affidavit, Mr. Gaddis also testifies that, on this date, he told LPN Kemp about his back injury, and she told him that he would not get an MRI. Dkt. 105-1 at 7. LPN Kemp does not report having observed or communicated issues with Mr. Gaddis's back to NP Washington. *See generally* dkt. 104.

On June 25, 2021, LPN Kemp saw Mr. Gaddis because an officer told her that Mr. Gaddis could not walk, sit, or stand. Dkt. 104 at 3. She called NP Washington, who told her to send Mr. Gaddis to the hospital, which she did. *Id*. He returned to the Jail with a diagnosis of sciatica. *Id*. On June 26, NP Washington prescribed Flexeril, ibuprofen, and Tylenol. Dkt. 104-2 at 2. Also, on that day, Mr. Gaddis told LPN Kemp that the emergency room doctors said he needed an MRI, but she told him that he would not get an MRI while he was at the Jail. Dkt.104 at 10.

On September 9, 2021, LPN Kemp received a sick call request from Mr. Gaddis about his legs and back hurting. Dkt. 104 at 4. She communicated this information to NP Washington, who prescribed Mobic. *Id*. Mr. Gaddis continued to take Mobic through the rest of his time at the Jail. Dkts. 104-2 at 47–57.

NP Washington did not see Mr. Gaddis until March 18, 2022—some ten months after Mr. Gaddis arrived at the Jail. Dkt. 52 at 1. Before that, he did not order any treatment for Mr. Gaddis's

7

knee pain specifically, but Mr. Gaddis did receive pain medication (Mobic) for back and leg pain. Dkt. 104-at 47–57. When NP Washington saw Mr. Gaddis, he noted that Mr. Gaddis's gait was initially guarded on the right side but returned to normal as he was walking back to his cell. Dkt. 52 at 2. NP Washington continued Mr. Gaddis on Mobic and told him to take over-the-counter Tylenol as need for additional pain. *Id.* He told Mr. Gaddis to follow a home-exercise program. *Id.* NP Washington testifies that he thought Mr. Gaddis's pain was not significant because Mr. Gaddis asked to be a trustee and most trustee jobs are physical jobs. *Id*.

In his summary judgment affidavit, Mr. Gaddis testifies that NP Washington did not actually examine him during the visit and just took his blood pressure with a battery powered blood pressure cuff. Dkt. 105-1 at 25. He also testifies that LPN Kemp told NP Washington that Mr. Gaddis had requested a trustee job, and NP Washington said that he would approve Mr. Gaddis's request if he stopped complaining about his injuries. *Id.* at 25–26. He testifies that, during the visit, NP Washington said he wasn't there to take away Mr. Gaddis's pain but just to improve his ability to maneuver. *Id.* at 25.

On June 16, 2022, Mr. Gaddis submitted a sick call request complaining of pain in his back, hip, leg, and knee. Dkt. 104 at 5. LPN Kemp called NP Washington, who entered orders directing Mr. Gaddis to buy Tylenol from the commissary. *Id.*; dkt. 104-2 at 3. NP Washington testifies that Tylenol was appropriate because Mr. Gaddis was already taking Mobic, and Mr. Gaddis's complaints were very common pain complaints of a chronic nature. Dkt. 104-2 at 3. He continued to receive Mobic until he left the Jail about two weeks later. Dkt. 104-1 at 47–57. During that time, LPN Kemp saw Mr. Gaddis walk without difficulty on two occasions and stand up from a stool without difficulty on one occasion. Dkt. 104 at 5.

After Mr. Gaddis was released from the Jail, he was diagnosed with a torn meniscus and had surgery to repair it on November 30, 2022. Dkt. 105-1 at 5. He testifies that he suffered from knee pain throughout his incarceration. *Id.*

### 2. High Blood Pressure

When Mr. Gaddis was booked into the Jail, he reported having high blood pressure. Dkt. 104-1 at 7. On September 24, 2021, LPN Kemp met with Mr. Gaddis and took his blood pressure, which was 172/106, an elevated reading. Dkt. 104 at 4. She asked Mr. Gaddis if he had snorted any nicotine pouches, and he said he had. *Id.* She called NP Washington and told him about the elevated blood pressure. *Id.* NP Washington directed her not to take Mr. Gaddis's blood pressure if he had been snorting nicotine pouches or taking caffeine and to place him on medical observation to monitor his blood pressure. Dkt. 104-2 at 2. Two days later, Mr. Gaddis was placed on medical watch with observations of his blood pressure every four hours. Dkt. 104 at 4. NP Washington testifies that the purpose of the observation was to "facilitate Mr. Gaddis making better choices" and to allow medical staff to get accurate blood pressure readings so NP Washington could determine if Mr. Gaddis needed blood pressure medication. Dkt. 104-2 at 2. Mr. Gaddis's blood pressure was monitored for two days. Dkt. 104 at 4. LPN Kemp reported the blood pressure readings to NP Washington, who ordered Clonidine, a blood pressure medication. Dkt. 104 at 4; dkt. 104-2 at 3. Mr. Gaddis continued to receive Clonidine for the rest of his time at the Jail, dkt. 104-1 at 47–57, although he testifies in his summary judgment affidavit that he continued to have elevated blood pressure readings at times, dkt. 105-1 at 25.

On October 16, 2021, Mr. Gaddis had chest pains, and his heart was beating hard. Dkt. 105-1 at 18. The nurse refused to check his blood pressure, even though he had not had caffeine or nicotine for several hours. *Id.*

As explained, NP Washington did not see Mr. Gaddis until March 18, 2022. NP Washington testifies that he examined Mr. Gaddis's heart and that Mr. Gaddis had a regular heart rate and rhythm, dkt. 52 at 2, but Mr. Gaddis testifies that NP Washington did not examine him at all beyond taking his blood pressure, dkt. 105-1 at 25–26. During that visit, Mr. Gaddis's blood pressure was elevated. Dkt. 52 at 2. But NP Washington reviewed Mr. Gaddis's chart and saw that his blood pressure readings were usually within the normal range, so he thought that Mr. Gaddis's elevated blood pressure might be the result of anxiety associated with the medical appointment. Dkt. 52 at 2. He ordered weekly blood pressure checks. *Id.* Mr. Gaddis continued to receive Clonidine during the rest of his time at the Jail. Dkt. 104-1 at 47–57. LPN Kemp took his blood pressure on June 22, 2022, and the results were within a normal range. Dkt. 104 at 5.

### 3. Hand Injury

On October 7, 2021, Mr. Gaddis was sent to the emergency room for pain and swelling in both hands after he punched a wall. Dkt. 105-1 at 5. The emergency room doctor diagnosed Mr. Gaddis with a fracture of the fifth metacarpal bone (which is in a finger) in his right hand. *Id.* at 5, 48. The treatment record from the emergency room visit indicates that the doctor ordered that Mr. Gaddis follow up with orthopedic doctor Kevin Kline within five to seven days. *Id.* at 49. The emergency room did not splint Mr. Gaddis's fingers, and he returned to the Jail with an ice pack on his hand and an otherwise untreated broken finger. *Id.* at 6. Once he returned to the Jail, Mr. Gaddis never saw Dr. Kline or any other outside physician, and his broken finger was never treated. *Id*. A progress note signed by Nurse Kemp on October 8, 2021, states that she notified NP Washington about Mr. Gaddis's injury and that no follow-up appointment was scheduled because Mr. Gaddis was not wearing a splint as ordered by the emergency room. *Id.* at 61.

## IV.
## Discussion

Mr. Gaddis alleges that NP Washington and LPN Kemp provided him with constitutionally inadequate care for his various medical conditions. A pretrial detainee's unconstitutional medical care claim, brought under the Due Process Clause of the Fourteenth Amendment, is analyzed according to the objective unreasonableness inquiry laid out in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). *See Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). A defendant violates a pretrial detainee's due process right to constitutionally acceptable medical care if:

> (1) there was an objectively serious medical need; (2) the defendant committed a volitional act concerning the [plaintiff's] medical need; (3) that act was objectively unreasonable under the circumstances in terms of responding to the [plaintiff's] medical need; and (4) the defendant act[ed] "purposefully, knowingly, or perhaps even recklessly" with respect to the risk of harm.

*Gonzalez v. McHenry County, Ill.*, 40 F.4th 824, 828 (7th Cir. 2022) (quoting *Miranda*, 900 F.3d at 353−54). "This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (cleaned up). Defendants make arguments only as to whether the care in this case was objectively unreasonable, *see generally* dkt. 103, so the Court addresses only that issue.

Genuine issues of material fact exist that preclude the entry of summary judgment in Defendants' favor as to whether they provided objectively unreasonable treatment. For example, Mr. Gaddis has designated evidence that he broke his finger and received no treatment, even though the emergency room doctor had directed that he be seen by an outside orthopedic physician and the emergency room did not splint his finger. Based on the designated evidence, a reasonable jury could conclude that LPN Kemp told NP Washington that Mr. Gaddis was not wearing a splint

11

as directed by the emergency room and that doing so was unreasonable because the emergency room did not splint Mr. Gaddis's fingers, making it impossible for him to wear a splint. And, even if LPN Kemp wrongly told NP Washington that Mr. Gaddis was disobeying the emergency room doctor's orders to wear a splint, a reasonable jury could conclude that it was unreasonable for NP Washington to do *nothing at all* for Mr. Gaddis's broken finger. A reasonable jury could also conclude that it was unreasonable for NP Washington to rely on LPN Kemp's report rather than actually looking at Mr. Gaddis's emergency room discharge papers or examining Mr. Gaddis to determine the proper course of treatment.

As another example, the designated evidence shows that Mr. Gaddis told LPN Kemp that he had dislocated his knee, that LPN Kemp observed that he walked with his left leg off the ground, and reported the information she had gathered from Mr. Gaddis to NP Washington. But NP Washington has testified that it appeared to him that Mr. Gaddis's knee injury was chronic and long-standing and it did not impact his ability to function and walk, so NP Washington decided not to order an MRI, prescribe medication, or send Mr. Gaddis to the hospital. Based on LPN Kemp's testimony, a reasonable jury could conclude that NP Washington knew that Mr. Gaddis's knee injury was impacting his ability to walk and refused to treat it.

As a final example, the designated evidence shows that, despite knowing about Mr. Gaddis's various medical issues, NP Washington did not actually see him until March 18, 2022— about 10 months after he got to the Jail and only after the Court ordered Defendants to respond to Mr. Gaddis's motion for preliminary injunction. *See* dkt. 29 (Jan. 19, 2022, Order directing Defendants to respond to preliminary injunction motion with their answer). The designated evidence taken in the light most favorable to Mr. Gaddis also shows that, even when NP Washington finally saw Mr. Gaddis, he did not actually do an examination. A reasonable jury

could conclude that it is unreasonable to continue to direct a patient's care based solely on reports from an LPN and without ever talking to or examining a patient over the course of 10 months, especially when NP Washington knew that Mr. Gaddis had made complaints about multiple medical issues. And a reasonable jury could conclude that it was unreasonable to simply continue with a course of treatment without actually examining the patient, even though the patient continued to complain of pain.

For all of these reasons, material issues of fact remain for trial as to both Defendants. The Court recognizes that Mr. Gaddis has alleged that each Defendant provided inadequate care as to multiple medical conditions. Because Mr. Gaddis has raised genuine issues of material fact as to at least one condition for each Defendant, the Court need not resolve whether Mr. Gaddis has raised genuine issues of material fact as to whether these defendants also provided objectively unreasonable care as the other conditions. Rather, because courts "must examine the totality of the relevant facts and circumstances" when deciding whether medical care for a pretrial detainee was objectively unreasonable, *see Jackson v. Sheriff of Winnebago Cnty., Illinois*, 74 F.4th 496, 502 (7th Cir. 2023), disputes about the facts related to those conditions are better resolved at trial, during which the jury will consider the entire course of Mr. Gaddis's treatment. *See also Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999) (under Eighth Amendment deliberate indifference standard, court "must examine the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs") (cleaned up).

## V.
## Conclusion

For the reasons stated above, Defendants' summary judgment motion, dkt. [101], is **denied**. Because Mr. Gaddis's claims will be resolved by settlement or trial, the Court *sua sponte* reconsiders its denial of Mr. Gaddis's motion for assistance with recruiting counsel, dkt. [50], to

13

the extent that the Court will attempt to recruit counsel to represent Mr. Gaddis. In addition, because Mr. Gaddis has been released from incarceration, he must provide the Court with updated information about his financial status so that the Court can confirm that he is still eligible for the appointment of counsel. Accordingly, on or before **March 19, 2024**, Mr. Gaddis shall complete and return the attached motion for leave to proceed *in forma pauperis*. If he fails to do so, the Court will cease its efforts to recruit counsel for Mr. Gaddis, and he will be required to pursue this action pro se. The Court will inform the parties when the recruitment process is complete.

The **clerk is directed** to enclose a blank form motion for leave to proceed *in forma pauperis* with Mr. Gaddis's copy of this Order.

**IT IS SO ORDERED.**

Date: 2/21/2024

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

DELBERT S. GADDIS, III
358 N. Sycamore Rd
Taswell, IN 47175

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

Travis W. Montgomery
Bleeke Dillon Crandall, P.C.
travis@bleekedilloncrandall.com